UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER LAPPING,<br><br>  Plaintiff,<br><br>  v.<br><br>WYDHAM VACATION OWNERSHIP, INC., et al.,<br><br>  Defendants. | Case No. 19-cv-07549-DMR<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 30, 36 |

On November 19, 2018, Plaintiff Christopher Lapping filed this action in San Francisco Superior Court, alleging state law claims against Defendants Wyndham Vacation Ownership ("WVO"), Wyndham Worldwide Corporation, Derek Milholland, and Matthew Muro. [Docket No. 1-1 ("Compl.").] Lapping's claims arise from his employment with and termination by WVO. On March 4, 2020, the court dismissed Wyndham Worldwide Corporation pursuant to agreement of the parties. [Docket No. 20.] On September 28, 2020, the court granted Muro's motion for summary judgment. [Docket No. 53.] WVO and Milholland now move for summary judgment.[1] [Docket Nos. 36 ("Mot."), 42 ("Reply").] Lapping opposes. [Docket No. 40 ("Opp.").] The court held a hearing on October 1, 2020.

For the reasons stated below, Defendants' motion is granted.

I. **BACKGROUND**

The following facts appear in the record.[2] Where indicated, the court cites the complaint to

---

[1] In this order, "Defendants" refers only to the moving parties since the other defendants are no longer parties to this action.

[2] Lapping filed objections to some of Defendants' evidentiary submissions. [Docket 40-3, Objections to and Motion to Strike Facts in Defendants' Affidavits ("Mot. to Strike.").] In reaching its decision, the court does not rely on any of the evidence objected to by Lapping. Accordingly,

provide background information.

### A. Lapping's Employment

WVO owns or operates approximately 180 vacation resorts and sells timeshares for its resorts from offices located throughout the United States. Compl. ¶ 4. In March 2014, Lapping began working for WVO as a sales representative at the company's Kona, Hawaii location. [Docket No. 40-1, Declaration of Christopher Lapping ("Lapping Decl.") ¶ 6.] Upon Lapping's request, he was transferred to WVO's Canterbury location in San Francisco around January 2016. *Id.* ¶ 7. Milholland, Lapping's supervisor, was Vice President of Sales in the Northern California region at that time. Docket Nos. 36-2, 36-3, Declaration of Conor Dale ("Dale Decl."), Ex. 5, Deposition of Derek Milholland ("Milholland Depo.") at 11:17-21; Compl. ¶ 6. Lapping first communicated with Milholland sometime after he started working at the Canterbury. Dale Decl., Ex. 3, Deposition of Christopher Lapping, Volume 2 ("Lapping Depo., Vol. 2") at 50:17-21.

On April 8, 2016, Lapping was promoted to front line sales manager at the Canterbury. Lapping Decl. ¶ 8; Dale Decl., Ex. 2, Deposition of Christopher Lapping, Volume 1 ("Lapping Depo., Vol. 1") at 74:9-12. In early July 2016, Lapping's manager Jason Cooksey asked Lapping to transfer to WVO's Donatello property, also located in San Francisco.[3] Compl. ¶ 10; *see* Lapping Decl. ¶ 9. When Lapping transferred to the Donatello, Muro became his supervisor. Compl. ¶ 5. To Lapping, his first few months at the Donatello seemed to go well, and the team exceeded its sales budget. *Id.* ¶ 11. Things began to change around October 2016, when two new employees were hired. *Id.* The new employees' sales numbers were "not great," and according to Lapping, Muro "did everything he could to get them to quit." *Id.* Lapping also noticed that Muro was constantly gambling on his phone. *Id.* ¶ 12. More than once, he heard Muro tell sales representative Cameron

---

the motion to strike is denied as moot.

[3] Lapping's declaration states that Milholland asked Lapping to transfer. Lapping Decl. ¶ 9. The complaint says that he transferred at Cooksey's request. Compl. ¶ 10. Lapping's February 13, 2017 email complaint to WVO represents that both Muro and Cooksey asked him to transfer. [Docket No. 36-5, Declaration of Kaui Crivello ("Crivello Decl."), Ex. L at Bates No. WVO000277.] The apparent discrepancy is not material to this motion.

Maxwell to "do whatever it takes to make a sale," including "lie, cheat and steal." *Id.* ¶¶ 17, 22[4]. According to Lapping, Muro "would often brag that he had human resources in his back pocket and . . . that he could do what he wanted." *Id.* ¶ 15. Around the same time, Muro banned Lapping from working at the owners' tables. *Id.* ¶ 12. Lapping heard from some sales representatives that Muro was "out to ruin [his] career." *Id.* ¶ 16. Lapping represents that Muro's management of the Donatello and professed intention to ruin his career made him feel stressed and fearful of losing his job. *Id.* ¶ 18.

### B. Complaints Against Lapping and Muro

Niloufer Bassa, a sales representative at the Donatello, complained about Lapping and Muro on January 4, 2017. Docket No. 36-5, Declaration of Kaui Crivello ("Crivello Decl.") ¶ 9, *see id.*, Ex. F. Kaui Crivello, the Director of WVO's Human Resources ("HR") Department, received notice of Bassa's complaints in early January 2017. *Id.* ¶ 9. Bassa reported that she was unjustifiably denied time off; that Lapping was "pushing her out the door by asking her to resign"; that Lapping had "humiliated her in front of the staff by sending her home for being negative"; and that Lapping lied to customers in order to sell products. *Id.*, Ex. F at Bates Nos. WVO001829-30.

On January 19, 2017, Bassa submitted another complaint by email. Crivello Decl., Ex. G. She stated that her aim was "to inform Wyndham of what has gone on at the [Donatello]." *Id.* at Bates No. WVO002025. She complained that Muro "has done nothing to help new reps succeed," "has driven everyone out with his toxic personality," and "has lost any credibility and respect he may have had." *Id.* She reported that "[t]he lies have continued at the site" and that the employees "constantly have to hear him mean mouth his colleagues." *Id.*

On January 23, 2017, Crivello contacted Bassa to learn more about her concerns. Crivello Decl. ¶¶ 13-15; *id.*, Ex. H. Bassa sent another email on January 25, 2017, listing some clients who "have all been lied to [by] Matt Muro and Chris Lapping." *Id.*, Ex. I at Bates No. WVO000257. She stated, "There has always been talk about lying. It's accepted. It's become a joke." *Id.* Bassa also reported that all the women doing administrative work and on the sales team "have complained

---

[4] Paragraphs 21-25 in Lapping's declaration are erroneously numbered 14-18. To avoid ambiguity, the court cites the paragraph numbers as they should appear.

about being harassed by [Lapping]." *Id.* at Bates No. WVO000258. On February 3, 2017, Crivello spoke with Bassa about the issues Bassa had raised. Crivello Decl. ¶ 14. Bassa told Crivello that she did not want to return to work until her concerns were resolved because of the "hostile work environment with Mr. Muro and Mr. Lapping." *Id.* She said that Muro and Lapping would "say anything to make a sale." *Id.*

On February 6, 2017, Crivello received notice that Arthur Allione (another WVO employee) quit his employment at the Donatello. Crivello Decl. ¶ 15. He reported that he left because the "sales practices were very misleading" and there was a "hostile work environment." *Id.*; *see* Crivello Decl., Ex. J. At the same time, Crivello was informed that two other sales representatives, Paula Carpe and Ashley Jennings, also stopped showing up to work without giving a reason. *Id.* ¶ 15. They were fired by Lapping and Muro for "no call/no show." *Id.* In early February 2017, Crivello contacted Laurie Saltzman-Kovatch, WVO's Regional Vice President of HR, about the possible need for a formal investigation into the Donatello and its management team. *Id.* ¶ 16; Docket No. 36-6, Declaration of Laurie Saltzman ("Saltzman Decl.") ¶ 3. In response, Saltzman directed HR representative Barbara Masticola to interview Carpe and Jennings about why they had stopped working. Saltzman Decl. ¶ 3. According to Masticola's interview notes, Jennings stated that her experience was "[a]wful . . . once [Lapping] came on board" and that she was "not the only person having issues." *Id.*, Ex. 2 at Bates No. WVO001668. She told Masticola that it was "mostly females that left." *Id.* Carpe similarly reported that there were "[u]nfair practices, lying, [and] misrepresentation[s]," including by Muro and Lapping. *Id.* at Bates No. WVO001670.

On February 12, 2017, WVO Quality Assurance Manager Linda Tanner sent an email to Muro, Milholland, Crivello, and Saltzman (among others) about complaints WVO had received from customers about Maxwell, as documented in Sales Complaint/Inquiry Forms ("SCIFs"). Crivello Decl., Ex. K. Tanner reviewed those SCIFs with Maxwell at a meeting where Lapping was present. Saltzman Decl., Ex. 3. Tanner recommended that WVO issue a write up to Maxwell based on the issues raised in the SCIFs. *Id.*

    **C.**    **Lapping's Complaint**

On February 13, 2017 at 7:02 p.m. PST, Lapping sent an email to HR complaining about

various practices at the Donatello. Lapping Decl. ¶ 20; Crivello Decl., Ex. L. He primarily discussed Muro's conduct, reporting that Muro "degrade[ed], yell[ed], and scream[ed]" at employees to get them to quit; that Muro blocked Lapping from the owner tables; that Muro gambled on his phone all day; and that Muro took credit for deals closed by other employees. Crivello Decl., Ex. L at Bates No. WVO000278. Lapping also reported that Muro would "randomly take off of work" and still take credit for the team's work. *Id.* According to Lapping's complaint, Muro instructed sales managers and representatives to "remove certain books and documents from the New owners kits" so that the "purchasers do not see how many points it costs to stay at our resorts." *Id.* at Bates No. WVO000279. Muro also allegedly used a company credit card for dinners with his wife and friends that he reported as work dinners with sales representatives. *Id.* at Bates No. WVO000280. Lapping wrote that Muro had dismissed concerns raised by sales representatives that some elderly purchasers did not understand what they were doing and instructed representatives to close those deals anyways. *Id.* Muro allegedly told Maxwell to "lie, cheat, and steal to get deals." *Id.* at Bates No. WVO000281. Lapping said in his email that he had not previously raised these issues with HR because "Muro said that HR is wrapped around his finger and they trust and believe in everything he says." *Id.* at Bates No. WVO000280.

At some point after he was hired, Lapping received the 2012 version of WVO's "Business Principles: A Code of Conduct for Employees" ("Code of Conduct").[5] Lapping Depo., Vol. 1 at 60:3-17; Crivello Decl., Exs. D and E (statements signed by Lapping acknowledging his receipt of the Code of Conduct, dated March 14, 2014 and January 1, 2016). The Code of Conduct provides, among other things, that WVO is "committed to ensuring" that it would not "cause or permit any employee to take any action that would knowingly result in the violation of any laws or regulations." Crivello Decl., Ex. C at Bates No. WVO000008. It also instructs managers to "diligently look for indications that unethical or illegal conduct may have occurred and report it." *Id.* at Bates No. WVO000009. WVO maintains the Wyntegrity Line, a telephone hotline where employees may,

---

[5] Lapping testified that he received the Code of Conduct either when he started at WVO's Kona location in March 2014 or when he started at Canterbury in January 2016. Lapping Depo., Vol. 1 at 60:3-17.

"either anonymously or by identifying" themselves, report unethical or criminal conduct. *Id.* at Bates No. WVO000011. Lapping acknowledged that he never called the Wyntegrity line, and prior to his email dated February 13, 2017, had not made any complaints about questionable conduct in the workplace. Lapping Depo., Vol. 2 at 72:17-25.

### D.  Investigation and Termination

WVO hired an outside law firm, Baker Hostetler LLP ("Baker"), to independently investigate the complaints WVO had received about the Donatello. Stalzman Decl. ¶ 7. WVO representatives contacted Baker on February 13, 2017 at around 1:07 p.m. PST to schedule a conference call regarding the proposed investigation for 1:30 p.m. PST that day. [Docket No. 36-7, Declaration of Sabrina Shadi ("Shadi Decl.") ¶ 4.] During that call, WVO formally retained Baker to conduct an investigation. *Id.* The call happened several hours before Lapping sent his complaint email. Sabrina Shadi, a partner at Baker who led the investigation, represents that she and Baker "did not receive any instructions or directions from any WVO representative regarding desired factual findings or recommendations as a result of the investigation." *Id. ¶* 5.

During the following month, Baker interviewed current and former WVO employees and reviewed relevant documentation. Shadi Decl. ¶ 5. Baker drafted an investigative report summarizing its conclusions and recommendations for WVO and sent this report to WVO on March 17, 2017. *Id.* ¶ 6; *id.*, Exs. 2-3. Some of Baker's conclusions include that sales practices at the Donatello were "deceptive, misleading, shady, [and] unethical" and that the "most egregious violations were committed by Lapping, Maxwell and Muro." *Id.*, Ex. 3 at Bates No. WVO000293. The report also indicated that Lapping "acted in an aggressive, angry or hostile manner toward certain sales representatives." *Id.* at Bates No. WVO000294. Baker recommended terminating Lapping's employment. *Id.* The investigators noted that "[e]ven if, as some evidence suggests, Lapping would attribute much of his conduct to being forced into it by Muro, he had an obligation as a manager and leader to bring any concerns forward through one of the several avenues available at WVO to report misconduct. Instead, he did not come forward with any complaint until he apparently feared his job was at risk . . . ." *Id.*

On March 17, 2017, Saltzman consulted with Christian Robertson, WVO's Executive Vice

President of Sales and Marketing, about the investigation findings. [Docket No. 36-1, Declaration of Chris Robertson ("Robertson Decl.") ¶¶ 7-9.] Robertson reviewed the investigative report and Baker's recommendation to terminate Muro and Lapping's employment. *Id.* ¶ 9. Robertson represents that he "honestly believed the conclusions and recommendations contained in the report" and ultimately decided that WVO should terminate Muro and Lapping. *Id.* ¶¶ 9-10. Robertson testifies that Lapping's report about Muro's conduct had "no impact on [his] decision to terminate Mr. Lapping's employment as, according to the report, Mr. Lapping had multiple opportunities to raise these concerns and apparently only did so after he feared his job was at risk." *Id.* ¶ 10. Saltzman also represents that the decision to terminate Lapping was based on the conclusions and recommendations in the investigative report. Saltzman Decl. ¶ 10. She testifies that Lapping's email complaint "had no impact regarding . . . my determination . . . that [WVO] may potentially need to terminate Mr. Lapping's employment." *Id.* ¶ 11. On March 22, 2017, Crivello informed Lapping that he was fired. *Id.* ¶ 16; Crivello Decl. ¶ 20, Ex. M. On the same day, WVO also terminated Muro's employment as a result of the investigation into the Donatello.[6] Crivello Decl. ¶ 21.

Lapping brings claims for (1) wrongful termination in violation of public policy; (2) violation of California Labor Code § 1102.5; (3) California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 *et seq.*; (4) fraud; and (5) negligent hiring, retention, and/or supervision of unfit employees. The fraud claim is brought against all Defendants while the remaining claims are brought only against WVO. Jurisdiction is based on diversity.

**II.    LEGAL STANDARD FOR SUMMARY JUDGMENT**

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

---

[6] Maxwell voluntarily resigned prior to the conclusion of the investigation. *See* Crivello Decl. ¶ 19.

1    (citation omitted). A genuine factual issue exists if, taking into account the burdens of production
2    and proof that would be required at trial, sufficient evidence favors the non-movant such that a
3    reasonable jury could return a verdict in that party's favor. *Id*. at 248. The court may not weigh the
4    evidence, assess the credibility of witnesses, or resolve issues of fact. *See id*. at 249.

5    To defeat summary judgment once the moving part has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  DISCUSSION

Defendants move for summary judgment on all claims.

#### A.  Wrongful Termination and Section 1102.5 Retaliation

Lapping claims that he was terminated in retaliation for complaining about practices he perceived to be illegal. Defendants counter that Lapping was fired because of his own misconduct. At the summary judgment stage, California courts evaluate wrongful termination claims using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Loggins v. Kaiser Permanente Internat.*, 151 Cal. App. 4th 1102, 1108-09 (2007). Courts also use this framework to analyze retaliation claims brought under California Labor Code § 1102.5. *Bowen v. M. Caratan, Inc.*, 142 F. Supp. 3d 1007, 1031 (E.D. Cal. Nov. 2, 2015). For this reason, the court analyzes Lapping's first two claims together. At the first stage of the *McDonnell Douglas* analysis, the plaintiff must show that "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028,

8

1042 (2005). The burden then shifts to the employer to provide a "legitimate, nonretaliatory explanation for its actions." *Hager v. Cty. of Los Angeles*, 228 Cal. App. 4th 1538, 1540 (2014), *as modified* (Aug. 19, 2014). To prevail, the plaintiff must show that the employer's explanation is pretextual. *Id.*

Only two portions of the *McDonnell Douglas* analysis are at issue in this motion: whether Lapping's termination was causally related to his complaints about illegal conduct and whether WVO's asserted reason for his termination is pretextual.[7]

### 1. Causation

WVO argues that Lapping has not raised a triable issue of fact that his termination was causally connected to his complaints about Muro's conduct. Mot. at 11-12. WVO cites the declarations of Robertson, Staltzman, and Shadi, which establish that Baker was hired to investigate complaints about the management team at the Donatello before Lapping ever submitted a complaint. Therefore, WVO argues, its decision to terminate Lapping resulted solely from the findings of Baker's investigation and not in retaliation for his complaint. This argument is not convincing. While it is undisputed that WVO hired Baker to investigate complaints against Lapping and others before Lapping sent his February 13, 2017 email, it is also undisputed that Lapping was fired *after* he sent the email. A reasonable juror could determine that Lapping was ultimately fired for complaining despite the fact that he was already under investigation when he complained. The temporal proximity of Lapping's complaint and his termination raises a triable issue as to causation. *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986) ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge."). *Arteaga v. Brink's Inc.*, cited by WVO, is not to the contrary. *See* 163 Cal. App. 4th 327 (2008). That case confirms that "temporal proximity, by itself, may be sufficient to establish a prima facie case of discrimination or retaliation," even though it is not enough to create a triable issue as to pretext. *Id.* at 334.

Thus, the central issue is whether Lapping can point to material disputes of fact from which

---

[7] The parties do not dispute that complaining about illegal conduct is a protected activity or that WVO's proffered reason for terminating Lapping is legitimate and nonretaliatory.

9

a reasonable juror could determine that WVO's proffered reason for his termination is pretextual.

### 2. Pretext

According to Defendants, Lapping was terminated based on the findings of misconduct in the Baker report. Mot. at 13. Lapping does not dispute that this articulated reason is legitimate and nonretaliatory; instead, he argues that a reasonable jury could nevertheless believe that the reason is pretextual. Opp. at 9. Lapping claims that he was the "fall guy" for the misconduct of other employees, specifically Muro and Milholland. Opp. at 8. He explains that WVO previously tolerated unethical sales practices by Muro.[8] He also asserts that WVO failed to take action against Milholland as a result of the Baker investigation.[9] Lapping correctly points out that "[s]howing disparate treatment or policy enforcement is a permissible means to establish pretext." *Wills v. Superior Ct.*, 195 Cal. App. 4th 143, 172 (2011). To show pretext under this theory, "comparative data . . . must be directed at showing disparate treatment between employees [who] are 'similarly situated' to the plaintiff in all relevant respects." *Gupta v. Trustees of California State Univ.*, 40 Cal. App. 5th 510, 519–20 (2019) (alterations in original) (citations omitted).

Lapping argued in his opposition brief that WVO's lack of action regarding similar allegations of misconduct against Muro and Milholland raises an inference that the stated reason for his termination (misconduct) was pretextual.[10] However, at the hearing, Lapping conceded that Milholland was not similarly situated to him. *See Wills*, 195 Cal. App. 4th at 172 ("Another employee is similarly situated if, among other things, he or she engaged in the same conduct without any mitigating or distinguishing circumstances." (internal quotation marks and citation omitted)). Therefore, the comparator pretext analysis fails as to Milholland.

With respect to Muro, Lapping's pretext theory fails because he did not proffer evidence to

---

[8] It is undisputed that Muro was also fired as a result of the investigation that began after Bassa complained in January 2017. Therefore, Lapping must present evidence that WVO tolerated similar conduct by Muro prior to that date.

[9] The Baker report recommended "further investigation and review with regard to Milholland's role in the decline of [the Donatello]" but did not recommend termination. Shadi Decl., Ex. 3 at Bates No. WVO000294.

[10] At the hearing, Lapping confirmed that there is no other basis for his pretext argument.

establish that Muro was treated more favorably when similar complaints were made about him. At the hearing, Lapping asserted that there were two complaints about Muro prior to Bassa's complaints in early 2017 and that WVO did not any action against Muro based on either complaint. The first complaint was filed by Bassa on July 28, 2016. *See* Docket No. 40-2, Declaration of Edward Higginbotham ("Higginbotham Decl."), Ex. 5. However, that complaint does not appear to allege any misconduct by Muro. Instead, it is targeted at Maxwell. *See id.* ("BASSA mentioned that this was not the first time that . . . she has had to . . . clean up MAXWELL'S mess."). In the complaint, Bassa explained that Muro instructed her to talk to some owners but the information she gave them contradicted information they previously received from Maxwell. *Id.* at Bates No. WVO001469. Bassa did not report that the prior information that she had received from Muro was incorrect or fraudulent. Therefore, Bassa's July 2016 complaint cannot serve as the basis for a claim that WVO treated Muro more favorably than Lapping.

Lapping also references a second complaint against Muro, citing to Crivello's deposition. *See* Higginbotham Decl., Ex 3, Deposition of Kaui Crivello ("Crivello Depo.") at 55:5-57:13. However, Lapping cannot rely on this complaint to support his pretext theory because the record lacks key information. Crivello's testimony does not indicate when the complaint was filed, what the complaint was about, or which allegations were substantiated.[11] Further, Crivello testified that she was not in WVO's California office when the investigation into that complaint occurred, so it is not clear that she has personal knowledge of the complaint. *See id.* at 56:23-57:2. This kind of vague and speculative evidence does not suffice at the summary judgment stage. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Accordingly, the record does not support Lapping's theory of pretext that WVO failed to take action against Muro for similar conduct.

---

[11] At the hearing, Lapping pointed to an email Bassa wrote to Crivello reporting that Muro lied to a customer. *See* Crivello Decl., Ex. I at WVO000256-57. Bassa told Crivello that the incident occurred in October 2016. *See id.* at WVO000257. However, Bassa's email was written on January 25, 2017. There is no indication that WVO had prior notice of the October 2016 incident or failed to take corrective action against Muro before Bassa's January 2017 email.

Since Lapping did not substantiate his comparator analysis with evidence in the record, the only evidence of pretext is the temporal proximity of his complaint and his termination. Temporal proximity on its own is insufficient to create a triable issue as to pretext. *Arteaga*, 163 Cal. App. 4th at 334. Lapping failed to meet his burden to show a genuine dispute of material fact as to his wrongful termination and section 1102.5 retaliation claims. Accordingly, WVO is entitled to summary judgment on those claims.

### B. Fraud

The elements of a fraud claim are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638 (1996). Defendants assert that Lapping has not established any of these elements. Because the court finds that Lapping fails to offer evidence that Defendants made any misrepresentation, it need not reach Defendants' remaining arguments.

According to Lapping, Defendants falsely represented that he would "be permitted to work for and be supervised by Defendants in a lawful manner, such that [he] would not be required to violate any state or federal statutes or regulations to perform his jobs for Defendants." Compl. ¶ 47. Lapping testified that WVO's onboarding documents, such as the Code of Conduct, contained these false representations. Lapping Depo., Vol. 2 at 64:1-11. He also testified that various WVO officers, including the CEO, would "randomly stop by sometimes" to hold meetings in which they would "restate Wyndham policies," including "[WVO's] business practices and proper sales practices policies." Lapping Depo., Vol. 2 at 64:12-65:8. According to Lapping, Milholland sometimes participated in these meetings and restated WVO's policies and practices. Lapping Depo., Vol. 2 at 65:11-25.

In California, "a representation ordinarily will give rise to a cause of action for fraud or deceit only if it is a representation of fact rather than opinion." *Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Assn.*, 205 Cal. App. 3d 1415, 1423 (1988). In other words, "an actionable misrepresentation must be made as to past or existing facts," *Borba v. Thomas*, 70 Cal. App. 3d 144, 152 (1977), whereas "predictions of future events are ordinarily considered non-actionable

expressions of opinion." *Richard P. v. Vista Del Mar Child Care Serv.*, 106 Cal. App. 3d 860, 865 (1980). In the context of federal securities actions,[12] the Ninth Circuit has explained that aspirational statements, such as those contained in a company's code of conduct, are not objectively verifiable and therefore cannot be factual. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) ("Such a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."). The same reasoning applies here. WVO's Code of Conduct states that WVO is "committed to ensuring" that employees will not engage in illegal action; it cannot reasonably be read to represent that all WVO employees always comply with every law and regulation. *See* Crivello Decl., Ex. C. at Bates No. WVO000008. WVO's aspirational commitments, and Milholland's reiterations of those commitments, are not statements of fact. Thus, Lapping has offered no evidence that either WVO or Milholland made any factual misrepresentations.

Defendants' motion is granted as to Lapping's fraud claim.

### C. Negligent Hiring, Retention, and/or Supervision

Under California law, "an employer may be liable to a third party for negligently hiring or retaining an unfit employee." *J.W. v. Watchtower Bible & Tract Soc'y of New York, Inc.*, 29 Cal. App. 5th 1142, 1163 (2018). Liability may also arise from an employer's "failure to provide adequate supervision of the agent's work." *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 788 (N.D. Cal. 2016) (applying California law). "Negligence liability will be imposed upon the employer if it knew or should have known that hiring the employee created a particular risk or hazard and that particular harm then materializes." *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 788 (N.D. Cal. 2016) (applying California law). To prevail on a negligent hiring/retention claim, a plaintiff must establish "(1) the existence of a legal duty to use due care; (2) a breach of that duty; and (3) the breach as a proximate cause of the plaintiff's injury." *Federico v. Superior Court (Jenry*

---

[12] Securities actions are informative to common law fraud claims because "the law on securities fraud is derived from common-law fraud." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

13

*G.)*, 59 Cal. App. 4th 1207, 1210–11 (1997).

In this case, Lapping asserts that WVO owed him a duty to properly supervise Muro and Milholland from engaging in unlawful conduct and breached that duty by failing to investigate and prevent such conduct. *See* Compl. ¶¶ 54-56. Lapping's evidentiary submissions supporting this theory are bare. With respect to Muro, he points again to the complaints filed by Bassa against Muro prior to January 2017. As explained above, Bassa's July 2016 complaint does not even appear to be about Muro because it largely discusses Maxwell. The only evidence in the record about any other complaints are the few lines in Crivello's deposition discussed above; that testimony does not indicate when such complaints were filed or what they were about. Lapping does not cite material facts to support his claim that WVO negligently retained or supervised Milholland.

Accordingly, Lapping has failed to offer evidence from which a reasonable jury could conclude that WVO was negligent in retaining or supervising Muro or Milholland, and Defendants are entitled to judgment on this claim.[13]

### D.   UCL

Under the UCL, unfair competition is defined as "any unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200. A business practice is "unlawful" under section 17200 if it violates an underlying state or federal statute or common law. *See Cal-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). An act is "unfair" if the act "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law." *Id.* at 187.

Lapping's UCL claim is predicated on his wrongful termination and fraud claims. Opp. at 11. As explained above, Lapping failed to substantiate either of those claims. Accordingly, his derivative UCL claim also fails.

---

[13] Because the court finds that Lapping has not offered evidence regarding the breach of any duty owed to him, it does not separately consider whether Lapping's negligence claim is barred by the state workers' compensation system.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion is granted in its entirety. The Clerk shall enter judgment for Defendants and against Lapping and close this case.

**IT IS SO ORDERED.**

Dated: October 29, 2020



_____
Donna M. Ryu
United States Magistrate Judge

15